**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICKY L. MILLER, JR., | : | |
| Petitioner | : | |
| | : | **No. 1:21-cv-02130** |
| v. | : | |
| | : | **(Judge Kane)** |
| MICHAEL ZAKEN, et al., | : | |
| Respondents | : | |

**MEMORANDUM**

Before the Court is a habeas corpus petition filed pursuant to 28 U.S.C. § 2254 through which pro se Petitioner Ricky L. Miller, Jr. ("Miller") challenges his 2012 conviction for first-degree murder and resulting sentence of life in prison in the Cumberland County Court of Common Pleas. The Court will deny the petition for writ of habeas corpus with prejudice.

**I.      BACKGROUND**

The Superior Court of Pennsylvania ("the Superior Court") has succinctly summarized the relevant factual background of Miller's conviction. See Commonwealth v. Miller, No. 1571 MDA 2012, 2014 WL 10980108, at *1 (Pa. Super. Ct. Feb. 19, 2014). In 2009, Miller was married to Ashley Miller ("Ashley"), with whom he had three children. See id. After the couple began to experience problems in their marriage, Miller asked Ashley to move out. See id. Ashley and their three children did so, moving in with her parents. See id.

Prior to moving out, Ashley had begun a romantic relationship with the eventual victim, Kenneth Geiger ("Geiger"), with whom she had had a prior romantic relationship. See id. After Miller and Ashley separated, Ashley informed Miller that she was seeing Geiger, but did not inform him that her relationship with Geiger had begun before she had moved out. See id. Miller proceeded to send a series of threatening statements and text messages to Ashley and

Geiger, which included language such as "brains going everywhere," "a dead man," and "its hunting season on Creekbend Drive," which was a reference to Geiger's home address.  See id.

On July 20, 2009, Miller demanded that Ashley come to their house, at which point he stated that he had found letters exchanged between Ashley and Geiger.  See id.  When Ashley got to the house, she observed that Miller was burning her childhood and family photographs. See id.  Ashley obtained a temporary protection from abuse order against Miller.  See id. Around this time, Miller began to make statements to several individuals, including Ashley's parents and a friend of his, that he wanted to kill Geiger.  See id.

Prior to the killing, Miller traveled approximately 75 miles from his home in Lancaster County to Geiger's place of employment in Cumberland County.  See id.  Miller did not find Geiger there, but he obtained his work schedule from another employee.  See id.  Miller then spent the night in his vehicle and followed Geiger after he was picked up by a coworker on his way to work.  See id.  Geiger noticed Miller following them and alerted the coworker, who maneuvered the vehicle behind Miller's vehicle and avoided further confrontation.  See id. Geiger contacted the police, who told him not to have any contact with Miller.  See id.

The night before the killing, Miller encountered Ashley and their children at a gas station on their way back from a day spent at a bowling alley with Geiger.  See id. at *2.  Miller told Ashley that he was on his way to Cumberland County to meet with police because Geiger had gotten him in trouble.  See id.  Miller then stated, "[y]ou just wait and see.  What I am about to do will make headlines."  See id.  The next day, Miller called Ashley and told her that he was going to Geiger's house.  See id.  Ashley tried to dissuade him from doing so.  See id.

Ashley and the children picked up Geiger in her car on July 26, 2009, shopped for groceries, and returned to Geiger's house.  See id.  Ashley was in the driver's seat, Geiger was in

the passenger seat, and the children were in car seats in the back of the car. See id. As they approached Geiger's house, Ashley noticed Miller waiting in a car by the house. See id. Miller drove his car in front of Ashley's car and approached the driver's side window. See id. After briefly speaking with Ashley, he reached into the car and shot Geiger in the head. See id. at *2, 9. Miller then told Ashley, "I told you never to f--- with me, you f-----g bitch," and fled in his car. See id. at *2 (alterations in original). Geiger died as a result of the gunshot.

Miller was arrested approximately 24 hours later, after which he stated to the police, "[Geiger] should be dead. I shot him with a .45 Glock from like a foot or something." See id. at *3. Miller subsequently stated that he had almost killed Geiger while he was following the victim to work. See id. Miller stated that he had pushed his hand past Ashley in an effort to not hurt Ashley or the children when he shot Geiger and indicated that he was aware that the children were in the car during the shooting. See id.

Miller was charged with homicide and reckless endangerment on July 27, 2009. See id. The Commonwealth subsequently announced its intention to present aggravating circumstances at sentencing, allowing the possibility that Miller could be sentenced to death if he was convicted of first-degree murder. See id. Miller filed a pretrial motion on January 13, 2011, arguing, inter alia, that Pennsylvania's death penalty statute was unconstitutional. See id. The trial court denied the motion on August 3, 2011. See id.

On July 19, 2012, Miller pleaded guilty to homicide generally, with the Commonwealth agreeing not to pursue the death penalty and Miller agreeing to proceed to a degree-of-guilt hearing pursuant to Pennsylvania Rule of Criminal Procedure 590(C).[1] See id. The trial judge

---

[1] Pennsylvania Rule of Criminal Procedure 590(C) provides that in cases where a defendant pleads guilty to murder generally, the case proceeds to a degree-of-guilt hearing, which is to be

conducted the degree-of-guilt hearing on August 1–3, 2012.  See id.  The court found Miller guilty of first-degree murder and sentenced him to life in prison without the possibility of parole. See id.

Miller filed a direct appeal of his conviction and sentence to the Superior Court on August 28, 2012, asserting: (1) that the trial court erred in concluding that Pennsylvania's death penalty statute is constitutional; and (2) that there was insufficient evidence to convict Miller of first-degree murder instead of voluntary manslaughter.  See id. at *3–4.  The Superior Court affirmed the conviction and sentence on February 19, 2014.  See id. at *10.  Miller filed a petition for leave to appeal to the Pennsylvania Supreme Court, which was denied on September 18, 2014.  See Commonwealth v. Miller, 99 A.3d 924 (Pa. 2014).

Miller filed a petition for state collateral relief pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA") on September 17, 2015, asserting, inter alia, that: (1) the trial court's plea colloquy did not comply with Pennsylvania Rule of Criminal Procedure 590(C); (2) counsel was ineffective for failing to properly advise Miller about the possibility of a jury determining his degree of guilt; (3) Rule 590(C) violates the Pennsylvania and United States Constitutions by allowing a judge rather than a jury to determine an element of an offense that triggers a mandatory minimum sentence; and (4) counsel was ineffective in failing to call an expert witness to testify to Miller's mental state at the time of the killing.  See generally Commonwealth v. Miller, No. CP-21-CR-2605-2009, 2020 WL 8881135 (Cumberland Cnty. Ct. of Com. Pl. June 12, 2020).

---

conducted by a jury "unless the attorney for the Commonwealth elects to have the judge, before whom the plea was entered, alone determine the degree of guilt."  See Pa. R. Crim. P. 590(C).

The Court of Common Pleas conducted an evidentiary hearing on the PCRA petition on October 25, 2017.  (Doc. No. 10-28.)  During the hearing, Miller testified that he agreed to plead guilty to murder generally based on his understanding that the Commonwealth would no longer pursue the death penalty if he did so.  (<u>Id.</u> at 10.)[2]  He first learned of the possibility of a general plea from his counsel.  (<u>Id.</u>)  Miller testified that, prior to pleading guilty, his counsel did not discuss with him the possibility of a jury determining his degree of guilt.  (<u>Id.</u> at 11.)  Rather, Miller's understanding of degree-of-guilt hearings was that "they were done in front of a Judge only" and that there was no option for a jury to conduct the hearing.  (<u>Id.</u>)  Miller testified that he was "a little concerned" about facing a jury with a potential death penalty on the table and that he had "second guesses" about such a situation.  (<u>Id.</u> at 12.)  Miller further testified that he worried that a jury would be "less sympathetic," that the prospect of a jury trial "bugged" him, and that he did not have "good feelings" about a potential jury trial.  (<u>Id.</u>)  Miller recalled that, prior to his plea hearing, nobody from the district attorney's office had explained to him that there was a possibility of a degree-of-guilt hearing being conducted by a jury.  (<u>Id.</u> at 15.)  Rather, Miller "assumed" from what he heard about degree-of-guilt hearings that a judge conducting the hearings was "just how they were done, period."  (<u>Id.</u>)

When asked to explain how the result of his plea hearing would have been different if he had been advised of the possibility of a jury conducting a degree-of-guilt hearing, Miller testified as follows:

> Well, I would be more educated for one.  I would have known that I could have requested a jury at least.  Whether it would have been granted, I don't know.  But, I would have known for some reason the Commonwealth was electing not to have a jury and had just had a Judge for some reason, but, you know, very well could

---

[2] The Court cites the transcript of the PCRA hearing using the page numbers corresponding to the ECF headings from this Court's docket.

have raised red flags.  I don't know, there is -- just the fact of not knowing and being informed.

(Id. at 17.)  Miller testified that having his degree of guilt determined by a jury "absolutely" could have changed the result of the degree-of-guilt hearing and stated that he was seeking a new degree-of-guilt hearing before a jury rather than a judge.  (Id. at 17–18.)  Miller then confirmed that the basis of his PCRA claim was that he did not knowingly waive his "right to have a jury determine [his] degree of guilt," and that he was "not asking the Judge to set aside the plea in its entirety, only the proceedings that followed the plea."  (Id. at 18.)  In other words, Miller clarified, he was seeking "[t]he same thing, but in front of a jury."  (Id.)  Miller subsequently conceded, however, that the decision on whether to proceed by judge or jury in a degree-of-guilt hearing pursuant to Pennsylvania Rule of Criminal Procedure 590(C) was left to the Commonwealth's discretion and that he did not have a right to have the hearing conducted by a jury.  (Id. at 35.)

Miller recalled that in preparation for his degree-of-guilt hearing, he had met with an expert witness hired by his counsel, Dr. Hume, about his mental state at the time of the killing. (Id. at 18–20.)  Miller further testified that, prior to the degree-of-guilt hearing, he had spoken with his counsel about presenting a defense that he had killed Geiger in a sudden and intense passion in response to provocation by Geiger.  (Id. at 21.)  Miller understood that such a defense would be part of his strategy during the hearing.  (Id.)

The court additionally heard testimony from Miller's counsel, Heidi Eakin ("Eakin" or "counsel").  (Id. at 41.)  Eakin testified that she advised Miller to plead guilty to murder generally after reviewing incriminating letters he had written after killing Geiger.  (Id. at 43.) Eakin testified that "to say [the letters] were destructive to his defense is an understatement." (Id.)  According to Eakin, the letters destroyed a theory of self-defense and "basically said this

6

was an assassination." (Id.)  Based on the content of the letters, Eakin was concerned that a jury would return a death penalty for Miller.  (Id. at 44.)  Eakin testified that she could not remember who first had the idea for Miller to plead guilty to murder generally, but noted that Miller "had repeatedly expressed concerns about jury trials." (Id. at 44–45.)

Eakin testified that, prior to the degree-of-guilt hearing, she and Miller never discussed the possibility of a jury conducting the hearing.  (Id. at 45.)  Eakin noted that "the discussions about [a] jury trial, and who was going to be in the courtroom, and his anxiety, was paramount on his mind at times." (Id.)  Eakin summarized Miller's thoughts during their discussions as "get rid of that jury.  I don't want to be in front of a jury." (Id.)  Eakin did not "believe for a minute" that Miller would have chosen to have a jury decide his degree of guilt if such a choice were presented to him.  (Id.)  Eakin further testified that agreeing to go before a judge for a degree-of-guilt hearing was "how we got the death penalty off the table." (Id. at 47.)  Eakin reiterated that the "overwhelming gist" of Miller's "concern" was "I do not want a jury involved." (Id. at 48.) "Ricky's anxiety," Eakin continued, "was a jury . . . and what they could do to him." (Id. at 49.)

Eakin testified that she had reviewed Hume's expert report in preparation for Miller's case and that it "did not support anything of a mental health defense, did not support diminished capacity, and certainly didn't support McNaughton [sic]."[3]  (Id. at 56.)  Eakin testified that she did not call Hume as an expert witness because she did not want to turn his report over to the Commonwealth.  (Id.)  Eakin noted that the report contained statements made by Miller to Hume that were "pretty not good for [Miller]." (Id.)  Eakin noted that in the statements in question

---

[3]  Pennsylvania follows the M'Naghton test for legal insanity, which relieves a defendant of criminal responsibility "if at the time of the committing (of) the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it that he did not know [what] he was doing . . . was wrong." See Commonwealth v. Hicks, 396 A.2d 1183, 1185 (Pa. 1979).

Miller was "blasting the victim" and "blasting his wife" and that Eakin therefore made the "tactical decision" not to call Hume as an expert witness to avoid disclosure of Hume's report to the Commonwealth.  (Id. at 56–57.)  Eakin noted that the only reason she saw to introduce Hume's report was to show statements by Miller that he saw a gun on Geiger's person prior to shooting him.  (Id. at 58.)  Eakin stated her belief that "the material that was not beneficial to Ricky far outweighed the fact that we had him mentioning the gun" and that she had other evidence that could be used to support the assertion that Geiger had a gun.  (Id. at 59.)

On cross-examination Eakin confirmed her understanding that the plea agreement between Miller and the Commonwealth was that the death penalty would no longer be pursued, Miller would plead guilty to murder generally, and that a degree-of-guilt hearing would be conducted in front of a judge.  (Id. at 62–63.)  Eakin testified that she was "absolutely" confident that Miller understood the terms of this agreement prior to pleading guilty.  (Id. at 63.)

The Court of Common Pleas denied the PCRA petition on June 12, 2020.  See Miller, 2020 WL 8881135, at *7.  Miller appealed to the Superior Court, which affirmed the denial of the PCRA petition on May 26, 2021, holding, in relevant part, that Miller waived his challenge to the constitutionality of Rule 590(C) by failing to raise the claim on direct appeal and that his challenges to the adequacy of the plea colloquy and his counsel's effectiveness failed on their merits.  See Commonwealth v. Miller, 255 A.3d 1277, No. 907 MDA 2020, 2021 WL 2138505, at *2–8 (Pa. Super. Ct. May 26, 2021).  Miller petitioned for allowance of appeal to the Pennsylvania Supreme Court, which denied the petition on November 30, 2021.  See Commonwealth v. Miller, 268 A.3d 275 (Pa. 2021).

Miller filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 7, 2021, and the Court received and docketed the petition on December 21, 2021.

(Doc. No. 1.)  Miller asserts four claims for habeas corpus relief: (1) Pennsylvania Rule of Criminal Procedure 590(C) violates the United States and Pennsylvania Constitutions by allowing a judge, rather than a jury, to decide an element of an offense that triggers a mandatory minimum sentence; (2) the trial court's plea colloquy did not comply with Rule 590(C), which constitutes a violation of Miller's Fourteenth Amendment right to due process; (3) counsel was ineffective by failing to advise Miller about the possibility of a jury determining his degree of guilt and for failing to object to the defective plea colloquy; and (4) counsel was ineffective in failing to present expert testimony regarding Miller's mental state at the time of the killing.  (Id. at 7–21.)

Respondents responded to the petition on June 6, 2022.  (Doc. Nos. 10, 10-1.) Respondents argue that Miller's claim challenging the constitutionality of Rule 590(C) and the plea colloquy should be denied as procedurally defaulted because they were waived on direct appeal, or, alternatively, that they should be denied on their merits.  (Doc. No. 10-1 at 9–19.) Respondents argue that the ineffective assistance of counsel claims should be denied on their merits.  (Id. at 19–28.)  Miller filed a reply brief on November 25, 2022, and a supplemental reply brief on April 13, 2023.  (Doc. Nos. 18, 22.)  Miller then filed a motion for leave to amend his petition on November 14, 2023.  (Doc. No. 24.)

## II.     LEGAL STANDARDS

### A.     Substantive Standard

Habeas corpus is an "extraordinary remedy" reserved for defendants who were "grievously wronged" by criminal proceedings.  See Calderon v. Coleman, 525 U.S. 141, 146 (1998).  The exercise of restraint by a federal court in reviewing and granting habeas corpus relief is appropriate due to considerations of comity and federalism.  See Engle v. Isaac, 456 U.S.

107, 128 (1982).  "The States possess primary authority for defining and enforcing the criminal

law.  In criminal trials they also hold the initial responsibility for vindicating constitutional

rights.  Federal intrusions into state criminal trials frustrate both the States' sovereign power and

their good-faith attempts to honor constitutional law."  Id.  States also have a recognized interest

in the finality of convictions that have survived direct review within the state court system.  See

Brecht v. Abrahamson, 507 U.S. 619, 620 (1993).

A district court may entertain an application for a writ of habeas corpus filed by a person

in state custody "only on the ground that he is in custody in violation of the Constitution or laws

of the United States."  See 28 U.S.C. § 2254(a).  If a claim presented in a Section 2254 petition

has been adjudicated on the merits in state court proceedings, the Anti-Terrorism and Effective

Death Penalty of 1996 ("AEDPA") sets stringent limits on a federal court's ability to issue a writ

of habeas corpus.  Specifically, AEDPA states, in relevant part:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—
>
> **(1)** resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> **(2)** resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The standard for obtaining habeas corpus relief under AEDPA is "difficult to meet."  See

Mays v. Hines, 592 U.S. 385, 391 (2021) (quoting Harrington v. Richter, 562 U.S. 86, 102

(2021)).  Federal habeas corpus relief is meant to guard against "extreme malfunctions in the

state criminal justice systems" and is not meant to substitute for "ordinary error correction

through appeal." See Harrington, 562 U.S. at 102–03 (citing Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J. concurring in judgment)).  "Federal habeas courts must defer to reasonable state-court decisions," see Dunn v. Reeves, 594 U.S. 731, 732 (2021), and may only grant habeas corpus relief when the state court's decision "was so lacking in justification" that its error was "beyond any possibility for fair minded disagreement," see Mays, 592 U.S. at 391 (quoting Harrington, 562 U.S. at 102).

### B.     Exhaustion and Procedural Default

Absent unusual circumstances, a federal court should not entertain a petition for writ of habeas corpus, unless the petitioner has first satisfied the exhaustion requirement articulated in 28 U.S.C. § 2254(b).  Under Section 2254(c), a petitioner will not be deemed to have exhausted his available state remedies if he had the right under the law to raise, by any available procedure, the question presented.  See O'Sullivan v. Boerckel, 526 U.S. 838 (1999).  A claim is exhausted when it has been "fairly presented" to the state court.  See Picard v. Connor, 404 U.S. 270, 275 (1971).  To that end, the federal habeas claim "must be the substantial equivalent of that presented to the state courts."  See Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997).  The petition must present the claim "in a manner that puts [the respondents] on notice that a federal claim is being asserted."  See Bronshtein v. Horn, 404 F.3d 700, 725 (3d Cir. 2005).  "The Supreme Court has instructed that a claim is not 'fairly presented' if the state court 'must read beyond a petition or brief . . . in order to find material' that indicates the presence of a federal claim."  Collins v. Sec'y of Pa. Dep't of Corrs., 742 F.3d 528, 542 (3d Cir. 2014) (quoting Baldwin v. Reese, 541 U.S. 27, 32 (2004)).  Moreover, a habeas corpus petitioner has the burden of proving the exhaustion of all available state remedies.  See 28 U.S.C. § 2254.  Overall, the

exhaustion requirement advances the goals of comity and federalism while reducing "piecemeal litigation."  See Duncan v. Walker, 533 U.S. 167, 180 (2001).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is an absence of available State corrective process." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).  Claims deemed exhausted because of a state procedural bar are considered procedurally defaulted.  See Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000).  The district court then analyzes the claims under the procedural default doctrine.  See id.  The purpose of this rule is to prevent habeas petitioners from avoiding the exhaustion doctrine by defaulting their claims in state court.  See Coleman v. Thompson, 501 U.S. 722, 732 (1991).  In Cone v. Bell, 556 U.S. 449 (2009), the United States Supreme Court explained:

> It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.  In the context of federal habeas proceedings, the independent and adequate state ground doctrine is designed to ensure that the State's interest in correcting their own mistakes is respected in all federal habeas cases.  When a petitioner fails to properly raise his federal claims in state court, he deprives the State of an opportunity to address those claims in the first instance and frustrates the State's ability to honor his constitutional rights.  Therefore, consistent with the longstanding requirement that habeas petitioners must exhaust available state remedies before seeking relief in federal court, we have held that when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.

See id. at 465 (internal quotations and citations omitted).

However, habeas corpus review is not barred in every instance in which a state court invokes a procedural rule to preclude its review of the federal claims asserted by a state prisoner. A state procedural rule can preclude federal habeas corpus review "only when the state rule is

'independent of the federal question [presented] and adequate to support the judgment.'"  See

Levya v. Williams, 504 F.3d 357, 365 (3d Cir. 2007) (citing Nara v. Frank, 488 F.3d 187, 199

(3d Cir. 2007)).  The requirements of independence and adequacy are distinct.  See id.  A rule is

"independent" if it is not dependent on any federal constitutional question, but "[a] state

procedural ground will not bar federal habeas relief if the state law ground is 'so interwoven with

federal law' that it cannot be said to be independent of the merits of a petitioner's federal

claims."  See Johnson v. Pinchak, 392 F.3d 551, 557 (3d Cir. 2004).  A rule is "adequate" if "it

was firmly established, readily ascertainable, and regularly followed at the time of the purported

default."  Levya, 504 F.3d at 366 (quoting Szuchon v. Lehman, 273 F.3d 299, 372 (3d Cir.

2001)).

     A petitioner whose constitutional claims have not been addressed on the merits due to

procedural default can overcome the default, thereby allowing federal court review, if the

petitioner can demonstrate either: (1) "cause" for the default and "actual prejudice" as a result of

the alleged violation of federal law; or (2) that the failure to consider the claims will result in a

"fundamental miscarriage of justice."  See Coleman, 501 U.S. at 750.  In order to show "cause

and prejudice" sufficient to overcome a state court default, a petitioner must demonstrate the

"cause" for his default and "prejudice" attributable thereto.  See Werts v. Vaughn, 228 F.3d 178,

192 (3d Cir. 2000) (citing Harris v. Reed, 489 U.S. 255 (1989)).  "[T]he existence of cause for a

procedural default must ordinarily turn on whether the prisoner can show that some objective

factor external to the defense impeded counsel's efforts to comply with the State's procedural

rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  Under the "prejudice prong," a petitioner

has the burden of showing "not merely that the errors at his trial created a possibility of

prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire

trial with error of constitutional dimensions." See United States v. Frady, 456 U.S. 152, 170 (1982); see also Holland v. Horn, 519 F.3d 107, 112 (3d Cir. 2008).

To show "fundamental miscarriage of justice," a petitioner must establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." See Schlup v. Delo, 513 U.S. 298, 326 (1995). Demonstrating actual innocence requires a stronger showing than that needed to establish prejudice. See id. In Goldblum v. Klem, 510 F.3d 204 (3d Cir. 2007), the Third Circuit explained the applicable two-step inquiry as follows: first, a "court must decide 'whether the petitioner has presented new reliable evidence . . . not presented at trial," and second, if a petitioner "puts forth new evidence not considered by the jury, a court asks 'whether it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" See id. at 225 (citing Hummard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004)). If a petitioner can establish cause and prejudice or a fundamental miscarriage of justice, the Court excuses his default and reviews the merits of the claim presented.

**C.     Standard for Claims Challenging Voluntariness of Guilty Plea**

A writ of habeas corpus may properly issue if it is determined that a guilty plea was not the result of "a knowing, and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." See Jamison v. Klem, 544 F.3d 266, 272 (3d Cir. 2008) (citing Boykin v. Alabama, 395 U.S. 238 (1969)). For a guilty plea to be knowing and intelligent, a criminal defendant "must be of sound mind, understand the nature of the charges and the direct penal consequences, and have the advice of competent counsel." See United States v. Yung, 37 F.4th 70, 81 (3d Cir. 2022). To be valid, a guilty plea must have been a "voluntary and intelligent choice among the alternative courses of action open to the defendant."

United States v. Jones, 336 F.3d 245, 253 (3d Cir. 2003).  The voluntariness of a guilty plea "can be determined only by considering all of the relevant circumstances surrounding it."  Brady v. United States, 397 U.S. 742, 749 (1970).  A guilty plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."  McCarthy v. United States, 394 U.S. 459, 466 (1969).

### D.    Standard for Ineffective Assistance of Counsel Claims

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court explained that there are two components to demonstrating a violation of the right to effective assistance of counsel.  First, the petitioner must show that counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness."  See id. at 668; see also Williams v. Taylor, 529 U.S. 362, 390–91 (2000). Second, under Strickland, the petitioner must show that he was prejudiced by the deficient performance.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.  To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  See id. at 694.  The Strickland test is conjunctive and a habeas petitioner must establish both the deficiency in the performance prong and the prejudice prong.  See id. at 687; Dooley v. Petsock, 816 F.2d 885, 889 (3d Cir. 1987).

The Strickland standard for ineffective assistance of counsel claims applies to actions by counsel during plea negotiations.  See Lafler v. Cooper, 566 U.S. 156, 162 (2012).  In the context of plea negotiations, counsel is required to give a defendant information sufficient "to make a

reasonably informed decision whether to accept a plea offer." See Shotts v. Wetzel, 724 F.3d 364, 376 (3d Cir. 2013) (citing United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992)).  To establish prejudice for a claim of ineffective assistance of plea counsel, a petitioner "must show the outcome of the plea process would have been different with competent advice."  See id. (quoting Lafler, 566 U.S. at 163. The petitioner "can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'"  Lee v. United States, 582 U.S. 357, 364–65 (2017) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

When considering an ineffective assistance of counsel claim, the Court's analysis is "doubly deferential" when a state court has already decided that counsel's performance was adequate.  See Dunn, 594 U.S. at 739.  The Court must apply a high level of deference both to counsel's actions and to the state court's determination that counsel's actions were constitutionally adequate.  See id.; Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003)).  The federal court may only grant habeas corpus relief if "every 'fairminded jurist' would agree that every reasonable lawyer would have made a different decision."  See id. at 2411 (emphasis in original) (quoting Harrington, 562 U.S. at 101).

## III.   DISCUSSION

At the outset, the Court will address Miller's motion for leave to amend his petition. Miller seeks leave to amend his petition because he "has learned that he did not properly present one of his constitutional claims for relief" and does not want the claim to be deemed procedurally defaulted.  (Doc. No. 24 at 1.)  He additionally notes that "new claims may not be

raised in response to a Respondent's Answer, [n]or in response to the Magistrate Judge's Report & Recommendation."[4]  (Id.)

The Court will deny the motion for leave to amend because Miller has not filed a proposed amended petition.  Amendment of habeas corpus petitions is governed by Federal Rule of Civil Procedure 15.  See 28 U.S.C. § 2242 (noting that habeas corpus petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"); Fed. R. Civ. P. 15 (providing rules for amendment and supplementation of civil pleadings).  Motions for leave to amend under Rule 15 are properly denied when a litigant fails to attach a proposed amended pleading, because without the proposed document, the Court "cannot evaluate the merits" of the motion for leave to amend.  See Lake v. Arnold, 232 F.3d 360, 374 (3d Cir. 2000). Moreover, decisions on whether to grant leave to amend are left to the sound discretion of the district court, see CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 629 (3d Cir. 2013), and leave to amend may be denied based on a litigant's undue delay in seeking leave to amend. See Foman v. Davis, 371 U.S. 178, 182 (1962).  Here, Miller did not seek leave to amend his petition until nearly two years after the filing of his original petition and a year after the petition became ripe.  Miller has not explained this significant delay in seeking leave to amend, and, absent such explanation, the Court finds that the request for leave to amend is properly denied for undue delay.  Accordingly, the motion for leave to amend will be denied based on both Miller's failure to file a proposed amended petition and his undue delay in seeking leave to amend.

---

[4]  Miller appears to be operating on the mistaken assumption that a report and recommendation will be issued by a United States Magistrate Judge prior to this Court ruling on his petition. Because this case has never been referred or assigned to a magistrate judge, no such report and recommendation will issue.

Turning to the claims asserted in the original petition, the Court will first consider Miller's constitutional challenge to Rule 590(C).  Miller asserts that Rule 590(C)'s procedure allowing judges to decide what degree of murder a defendant is guilty of is unconstitutional under Alleyne v. United States, 570 U.S. 99 (2013), which holds that any fact that increases a defendant's mandatory minimum sentence "is an 'element' that must be submitted to the jury," rather than decided by the court.  See Alleyne, 570 U.S. at 103; (Doc. No. 1 at 8).

The Superior Court deemed Miller's constitutional challenge to Rule 590(C) waived for Miller's failure to assert the claim on direct appeal of his conviction.  See Miller, 2021 WL 2138505, at *7.  Miller argues that this conclusion was erroneous because "Alleyne was not decided until [his] direct appeal was already filed and pending disposition," and thus he could not have asserted the claim on direct appeal.  (Doc. No. 1 at 9.)

This Court need not decide whether Miller's constitutional challenge to Rule 590(C) pursuant to Alleyne was waived on direct appeal because Alleyne does not apply retroactively to cases on collateral review.[5]  See United States v. Reyes, 755 F.3d 210, 212–13 (3d Cir. 2014); United States v. Winkelman, 746 F.3d 134, 136 (3d Cir. 2014).  Thus, regardless of whether the claim was waived on direct appeal, it may not be raised in this case on collateral review of Miller's conviction.  The claim will accordingly be denied.

Miller next argues that his Fourteenth Amendment right to due process was violated when the trial court conducted a plea colloquy that did not comply with Rule 590(C).  Because

---

[5] Miller argues that Alleyne applies retroactively to his case because it applies retroactively to cases on direct appeal and his case was still pending on direct appeal when Alleyne was decided. See (Doc. No. 18 at 14–15).  To benefit from such a rule, however, Miller would have had to assert the claim on direct appeal, and it is undisputed that he did not do so.  Accordingly, the sole question is whether he may assert the claim on collateral appeal after having failed to do so on direct appeal.  Reyes and Winkelman hold that he cannot.

this claim was denied on its merits in state court, AEDPA requires this Court to grant significant deference to the state court decision.  See 28 U.S.C. § 2254(d); Dunn, 594 U.S. at 732; Mays, 592 U.S. at 391.[6]

Miller's due process argument is based on the comment to Rule 590(C), which notes seven questions that courts "should" ask defendants before accepting their pleas pursuant to the rule.  See Pa. R. Crim. P. 590(C).  Miller argues that the plea colloquy in his case was defective because the trial court failed to ask the seventh question—"Does the defendant understand that the Commonwealth has a right to have a jury decide the degree of guilt if the defendant pleads guilty to murder generally?"  See id.; (Doc. No. 1 at 12–13).

As a preliminary matter, the Court notes that the relief Miller seeks through this claim appears to have shifted from his original claim in state court.  During PCRA proceedings, Miller specified that he was not seeking to invalidate his plea, but only "the proceedings that followed the plea," because he had not knowingly waived his "right to have a jury determine [his] degree of guilt."  (Doc. No. 10-28 at 18.)  Here, by contrast, Miller asserts that the relevant question is not "whether [he] had the right to select the fact finder, but rather his procedural deprivation of the knowledge that the Commonwealth could have chosen a jury, and had apparently thought its chances were better before the judge alone."  (Doc. No. 1 at 13.)  Miller asserts that without this knowledge, he "could not knowingly and voluntarily decide to enter the plea."  (Id.)  Thus, in the PCRA proceedings Miller sought a new degree-of-guilt hearing before a jury, whereas here he seeks to invalidate his guilty plea entirely.

---

[6] Although Respondents contend that this claim is procedurally defaulted because it was waived on direct appeal, see (Doc. No. 10-1 at 14–15), the Superior Court considered it on its merits on appeal from the denial of Miller's PCRA petition.  See Miller, 2021 WL 2138505, at *5 n.3. This Court will accordingly also consider the claim on its merits.

Miller's claim fails under either theory.  To the extent Miller seeks a new degree-of-guilt hearing before a jury because he had not knowingly waived his "right to have a jury determine [his] degree of guilt," his claim is meritless.  As the Superior Court noted in denying Miller's claim, see Miller, 2021 WL 2138505, at *6, Rule 590(C) clearly states that it is the Commonwealth, rather than the defendant, that has the right to decide whether a degree-of-guilt hearing will be conducted in front of a judge or a jury.  See Pa. R. Crim. P. 590(C) (stating that "[i]n cases in which the imposition of a sentence of death is not authorized, when a defendant enters a plea of guilty or nolo contendere to a charge of murder generally, the degree of guilt shall be determined by a jury unless the attorney for the Commonwealth elects to have the judge, before whom the plea was entered, alone determine the degree of guilt." (emphasis added)).  Thus, because Miller did not have a right to have the degree-of-guilt hearing conducted by a jury, he cannot obtain habeas corpus relief based on his supposedly unknowing waiver of that right.

As for Miller's request to invalidate his guilty plea based on the violation of Rule 590(C), the Court must determine whether the plea was the result of "a knowing, and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences."  See Jamison, 544 F.3d at 272 (citing Boykin, 395 U.S. at 238).  The state courts concluded that Miller knowingly and intelligently pleaded guilty to murder generally because the record reflected his desire to avoid having a jury act as the finder of fact.  See Miller, 2021 WL 2138505, at *5–6.

This Court finds that the state courts' analysis was neither contrary to clearly established federal law nor unreasonable.  The state court record is replete with testimony from Miller indicating that he understood that he was pleading guilty to murder generally so that he would not receive the death penalty and that his degree of guilt would be determined by a judge.  Specifically, Miller testified as follows:

Q:     Now, you already noted how you pled guilty generally to murder generally.  At that hearing, and for the record, page 17 and 18 of the guilty plea, the Court put the agreement on record.  And it doesn't sound like there is any dispute here.  The Court basically said he understands you are pleading to murder generally, the Commonwealth will not seek the death penalty, and instead we will proceed to a hearing to determine the degree of guilt, and then the Judge later already had a hearing date scheduled where he would decide the degree of guilt.  Do you agree with that?

A:     Yes.

Q:     So that was the general idea.  They are going to take the death penalty away, I am going to plead guilty, and your understanding of the agreement was we are going to go forward and the Judge is going to determine the degree of my guilt?

A:     Yes.  I thought that was the only way it could be done.

(Doc. No. 10-28 at 34–35.)

Although Miller argues that his lack of knowledge that the Commonwealth could elect to have a jury conduct the degree-of-guilt hearing meant that his plea was not knowing, the state courts found this argument "logically meritless" because Miller "had no desire for a jury trial and would not have made such a request in any event."  See Miller, 2021 WL 2138505, at *5.  This Court agrees.  Ample testimony from both Miller and Eakin indicates that Miller did not want to appear before a jury and was motivated by a desire to avoid a jury in pleading guilty.  See (Doc. No. 10-28 at 12 (testimony from Miller that he was "a little concerned" about appearing in front of a jury and that he had "second guesses" about doing so); id. (testimony from Miller expressing concern that a jury would be "less sympathetic" than a judge, that the prospect of appearing before a jury "bugged" him, and that he did not have "good feelings" about appearing in front of a jury); id. at 45 (testimony from Eakin that Miller "repeatedly expressed concerns about jury trials" to her); id. (testimony from Eakin that Miller's thought process appeared to be "get rid of that jury.  I don't want to be in front of a jury"); id. at 48 (testimony from Eakin that the gist of what Miller expressed to her prior to his plea was "I do not want a jury involved"); id. at 49 (testimony from Eakin that Miller had "anxiety" about what a jury "could do to him")).  Thus,

21

because the state courts' conclusion that Miller knowingly and intelligently pleaded guilty to murder generally is neither contrary to clearly established federal law nor unreasonable, this Court will deny habeas corpus relief on this claim.[7]

The Court will similarly deny habeas corpus relief with respect to Miller's claim that counsel was ineffective by failing to advise Miller about the possibility of a jury determining his degree of guilt and for failing to object to the defective plea colloquy. The Superior Court concluded that Miller could not establish prejudice for this claim because he could not establish a reasonable probability that he would have gone to trial absent counsel's actions. See Miller, 2021 WL 2138505, at *6. This conclusion is neither contrary to clearly established federal law nor an unreasonable application of federal law. As noted above, the state court record clearly indicates that Miller did not want a jury trial and wanted to avoid the death penalty. See (Doc. No. 10-28 at 10–12, 45, 48–49). Accordingly, because the Court agrees with the Superior Court's conclusion that Miller could not establish prejudice for his first ineffective assistance of counsel claim, the Court will deny this claim for habeas corpus relief.

---

[7] Miller additionally quotes Suarez v. Pennsylvania, see (Doc. No. 18 at 35), in which the court stated that "[w]here the trial court followed the dictates of the comment to Pennsylvania Rule of Criminal Procedure 590, federal law does not require a more detailed guilty plea colloquy." See Suarez v. Pennsylvania, No. 4:11-cv-00349, 2014 WL 2922283, at *6 (M.D. Pa. June 26, 2014) (internal quotation marks omitted). Thus, Miller argues, "[s]ince the trial court did not follow the dictates [of Rule 590(C)], [f]ederal law does then require a more detailed plea colloquy." (Doc. No. 18 at 35.) This argument commits the logical fallacy of denying the antecedent. In other words, it erroneously infers "from the logical sequence 'if P then Q' that 'not P' implies 'not Q.'" See Bell v. Houser, No. 1:22-cv-01383, 2023 WL 3727946, at *5 n.4 (M.D. Pa. May 30, 2023) (citing STEVEN PINKER, RATIONALITY 83 (1st ed. 2021)). Although compliance with Rule 590(C) may imply compliance with federal law, it does not follow logically from that proposition that noncompliance with Rule 590(C) implies noncompliance with federal law. The relevant statement in Suarez simply recognizes that the questions provided by the comment to Rule 590(C) are sufficient to satisfy federal law; it does not state that they are necessary to satisfy federal law.

Finally, Miller argues that Eakin provided ineffective assistance of counsel by failing to call Hume as an expert witness to testify to Miller's mental state at the time of the killing.[8] (Doc. No. 1 at 19–21.)  The Superior Court concluded that Miller was not entitled to relief on this claim because the record reflected that Eakin had a reasonable strategic basis for declining to call Eakin as a witness.  The record amply supports this conclusion.  Eakin testified during the PCRA evidentiary hearing that she made the tactical decision to not call Hume as a witness to avoid disclosing Hume's report to the Commonwealth because the report contained statements made by Miller that were harmful to his defense.  (Doc. No. 10-28 at 56–59.)  The Court will accordingly apply the substantial deference that AEDPA requires to both counsel's decision and the state court's judgment determining that the decision had a reasonable strategic basis and deny habeas corpus relief on this claim.  See Dunn, 141 S. Ct. at 2410.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Miller's petition for writ of habeas corpus with prejudice and deny his motion for leave to amend.  A certificate of appealability will not issue because no reasonable jurist would disagree with this ruling or conclude that the issues presented are adequate to deserve encouragement to proceed further.  See Buck v. Davis, 580 U.S. 100, 115 (2017) (citing Miller-El v. Cockrell, 537 U.S. 322, 336 (2003)).  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[8] Miller also appears to assert that counsel was ineffective for failing to have him evaluated by Hume.  See (Doc. No. 1 at 19–21).  To the extent this is asserted as a separate claim, it is denied as meritless.  The record clearly reflects that counsel had Miller evaluated by Hume.  See (Doc. No. 10-28 at 20).